United States District Court
Southern District of Texas

**ENTERED**

January 18, 2017

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| STARSHEKA LEWIS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-15-923 |
| | § | |
| CAROLYN W. COLVIN, | § | |
| ACTING COMMISSIONER OF THE | § | |
| SOCIAL SECURITY ADMINISTRATION | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before the court[1] is Defendant's Motion for Summary Judgment (Doc. 13). The court has considered the motion, the administrative record, and the applicable law. For the reasons set forth below, the court **RECOMMENDS** that Defendant's motion be **GRANTED**.

## I. Case Background

Plaintiff filed this action pursuant to 42 U.S.C. § 405(g) for judicial review of an unfavorable decision by the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") regarding Plaintiff's claim for disability insurance under Title II of the Social Security Act ("the Act").

## A. Medical History

Plaintiff was born on September 18, 1982, and was twenty-eight

---

[1] This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. See Doc. 5, Ord. Dated Sept. 21, 2015.

years old on the alleged disability onset date of December 31, 2010.[2]  Plaintiff earned a high school diploma and two years of college credits.[3]  Plaintiff is a veteran, working as a chief supply specialist in the U.S. Army from 2003, until she was honorably discharged in 2005.[4]  Plaintiff most recently worked as a pharmacy technician for Walmart for about six months in 2006, a babysitter for part of 2006, and a substitute teacher from 2009 to 2010.[5]  Plaintiff claimed that she stopped working on December 31, 2010, citing her physical impairments as the reason.[6]

### 1.  Knee Pain and Impairment

According to Plaintiff, she first experienced issues with her knees during an Army training exercise in 2003.[7]  Plaintiff attended physical therapy sessions for knee pain beginning in late 2008, during which she reported that she had trouble completing the exercises because of dislocated patellas in both knees.[8]  Additionally, Plaintiff said that she had fallen five times over the course of the previous year because her knees collapsed, and

---

[2]     See Tr. 82.

[3]     See id.

[4]     See Tr. 315, 798.

[5]     See Tr. 85-86, 315.

[6]     See Tr. 290.

[7]     See Tr. 553.

[8]     See Tr. 383.

that she had difficulty walking and standing.[9]  Plaintiff was discharged from physical therapy in January 2009 and instructed to continue to perform the exercises at home.[10]  Plaintiff's gait was observed as normal before and after completing physical therapy.[11]

At Plaintiff's visits to her chiropractor, Paul Roger, Jr., D.C. ("Dr. Roger") from May through early July 2009, Plaintiff reported varying levels of knee pain, ranging from "very mild" to "severe."[12] However, from July 16, 2009, through December 22, 2010, Plaintiff visited Dr. Roger multiple times and reported only very mild pain in her knees.[13]  At her visit on December 30, 2010, the day before the onset of her disability, Plaintiff reported that her knee pain was slightly worse than her pain on December 22nd, but still described it as only "minimal pain" in both knees.[14]  At Plaintiff's chiropractic appointment on January 7, 2011, Plaintiff reported "acute pain" in her knees that was "moderately worse since her previous visit."[15]  Plaintiff's knee pain ranged from moderate to minimal over the next several months of chiropractic visits.[16]

---

[9]     See Tr. 383, 408.

[10]    See Tr. 407.

[11]    See id.

[12]    Tr. 432-447.

[13]    See Tr. 448-60, 494-505.

[14]    Tr. 506.

[15]    Tr. 507.

[16]    See Tr. 509-23.

A magnetic resonance imaging ("MRI") was performed on Plaintiff's knees in March 2010, and both MRIs revealed "no evidence of abnormality."[17] Plaintiff again underwent MRIs of both knees in June 2011 which showed "no visualized abnormalities."[18] Additional MRIs were taken of both knees in July 2011.[19] The MRI of the left knee showed a minimal patchy bright proton density in the patella cartilage lining "of questionable clinical significance" and a nonspecific abnormal patella marrow signal intensity.[20] The MRI of the right knee showed an anterior cruciate ligamentous sprain, trace fluid in the knee joint, but no significant chondromalacia.[21]

Plaintiff reported to Dr. David Green, MD, ("Dr. Green") in July 2011 that her knees would collapse when standing about once a month.[22] At this appointment, Dr Green discussed with Plaintiff her medical options including conservative management or a surgical intervention; Plaintiff decided to continue conservative management of her knee issues.[23] At an appointment on April 9, 2013, it was noted that Plaintiff had "unstable patella that seldom bother[ed]

---

[17]   See Tr. 483-84.

[18]   See Tr. 618-19.

[19]   See Tr. 540-43.

[20]   See Tr. 540.

[21]   See Tr. 543.

[22]   See Tr. 553.

[23]   See Tr. 556.

her" and "no swelling, locking or instability" and "no pain."[24]

## 2. Neck and Back Pain

At a physical therapy session in late 2008, Plaintiff reported difficulty with mopping, sweeping, sitting for a prolonged period of time, and sleeping.[25] Plaintiff's physical therapist, Margaret V. Rozas ("Ms. Rozas") reported that Plaintiff had a normal range of motion in her trunk muscles and intermittent pain in her lower back.[26] At a follow-up visit, Plaintiff reported that she still was having lower back pain, but that it was "less frequent" and that she was not sure of the cause of the pain.[27]

Plaintiff underwent x-rays in July 2009, that showed Plaintiff's hips were not level with each other, which Dr. Roger opined "result[ed] in abnormal stress and imbalances of the lower extremities and the spine."[28] A computed tomography ("CT") scan conducted on Plaintiff's cervical spine in March 2010 was negative, showing no abnormalities.[29]

At Plaintiff's chiropractic visits with Dr. Roger from May through August 2009, Plaintiff's back and neck pain ranged from

---

[24]   Tr. 1600, 1613.

[25]   See Tr. 384.

[26]   See id.

[27]   Tr. 383.

[28]   Tr. 427-31.

[29]   See Tr. 487.

"very mild" to "very severe."[30]   At Plaintiff's appointment on December 16, 2010, she described her low back pain, mid back pain, and neck pain as very severe.[31]   However, this pain in her lower back, mid back, and neck "greatly improved" by her next visit on December 22, 2010, and was described as nominal.[32]   At Plaintiff's appointment on December 30, 2010, Plaintiff's low back pain was characterized as nominal, Plaintiff's mid back pain was minimal, and her neck pain was moderate.[33]   On January 7, 2011, Plaintiff's back pain was described as "moderately severe," but improved over the course of the next few weeks, returning to nominal and minimal levels at Plaintiff's visit on January 26, 2011.[34]

At a visit to the Veterans Administration ("VA") clinic in July 2011, Plaintiff reported experiencing neck pain for over a year that caused pain in her left shoulder and numbness in her left arm.[35]   In 2013, at an orthopedic consultation exam, it was noted that Plaintiff's back complaints were "mechanical" and that she had "a normal exam and x-rays."[36]

### 3.  Migraines

---

[30]   Tr. 432-59, 494-96.

[31]   Tr. 504.

[32]   See Tr. 505.

[33]   See Tr. 506.

[34]   See Tr. 508-10.

[35]   See Tr. 550.

[36]   See Tr. 1613.

At Plaintiff's chiropractic visits with Dr. Roger in 2009, Plaintiff complained of "occasional" migraines, that were sometimes very mild, and sometimes very severe.[37]  When Plaintiff returned to the chiropractor on December 16, 2010, Plaintiff reported "acute frequent aching headaches in the forehead area" that were "moderately worse since the last visit" and "severe frequent headaches at the temples" that were "much worse since her last treatment."[38]  However, Plaintiff's headaches were described as very mild on Plaintiff's appointments on December 22 and 30, 2010, and mild on January 7, 2011.[39]

An MRI of Plaintiff's brain conducted in February 2009 showed no abnormalities.[40]  Also, a CT scan was conducted on Plaintiff's brain in March 2010, which came back negative.[41]  After complaining of more frequent migraines, Plaintiff underwent another MRI of her brain in February 2012 that was normal.[42]

Plaintiff visited the VA in January 2011 complaining of ear pain that she associated with her headaches.[43]  Plaintiff originally

---

[37]    See Tr. 432-59.

[38]    See Tr. 504.

[39]    See Tr. 505-07.

[40]    See Tr. 896.

[41]    See Tr. 478.

[42]    See Tr. 815.

[43]    See Tr. 562.

visited her primary care physician in Louisiana about this problem, who referred her to an ear, nose, and throat ("ENT") specialist, but there was no diagnosis.[44]   Plaintiff's doctor said it was possible that her pain was related to a cerumen build-up in her ears or that it was a manifestation of her migraines.[45]

**B.**   **Application to the Social Security Administration**

Plaintiff protectively applied for disability insurance benefits on May 19, 2011, claiming an inability to work since December 31, 2010.[46]  On a disability report dated June 6, 2011, Plaintiff listed the following conditions: chondromalacia of both knees, migraines, laxity of ligaments, musculoskeletal lesions of the scapula trapezius muscles, kyphosis loss of cervical lordosis, back injury facet syndrome of lumbar spine, thoracic problems, cervical cranial syndrome, unlevel pelvis, and pelvic segmental somatic dysfunction.[47]

On June 20, 2011, Plaintiff completed a function report in which she claimed that her conditions limited her ability to work for the following reasons: her knees would "give away" and she would experience "stiffness, pain, episodes of dislocation, [and] flare ups" that would cause pain and swelling; her migraines caused

---

[44]     See Tr. 562-63.

[45]     See Tr. 566.

[46]     See Tr. 286-88.

[47]     See Tr. 290.

"dizziness" and, when she had a migraine, she could not tolerate noise or lights; and she experienced neck and back pain that made it difficult to sleep.[48]

In terms of Plaintiff's daily activities, Plaintiff stated that she took care of her two children with help from her family and friends.[49]  Plaintiff said that if she was feeling well, she could complete household chores, cook, and go to doctor's appointments.[50]  Plaintiff stated that, with regards to personal care, her oldest son would occasionally help her get dressed.[51]  She also said that she sometimes needed help using the toilet if she was experiencing knee issues.[52]

In the report, Plaintiff indicated that she prepared her own meals, including frozen and cooked meals.[53]  Plaintiff said that while she would cook "two to three times a week," her conditions affected her ability to prepare meals because she had difficulty standing for prolonged periods.[54]  Plaintiff was able to complete household chores with her oldest son's help but that she would not

---

[48]    Tr. 299.

[49]    See Tr. 300.

[50]    See Tr. 306.

[51]    See Tr. 300.

[52]    Id.

[53]    See Tr. 301.

[54]    Id.

perform chores if she was not feeling well.[55]  When Plaintiff left the house, she would drive or ride in a car, but that if she drove, she would not drive too far because of the pain.[56]  Plaintiff was able to shop at the grocery store and online for grocery and household items.[57]  Plaintiff was able to pay bills, handle a savings account, count change, and use a checkbook or money orders.[58]

Plaintiff disclosed that her hobbies and interests included reading and frequently watching television.[59]  Because of her impairments she occasionally had to "change [her] position" while watching television.[60]  Plaintiff's social activities consisted of spending time with others and attending church.[61]  Plaintiff reported that, because of her conditions, she was not able to stay long at family gatherings or take her sons to theme parks.[62]

The list of activities that Plaintiff said were affected by her conditions included lifting, squatting, bending, standing,

---

[55]     See id.

[56]     See Tr. 302.

[57]     See id.

[58]     See id.

[59]     See Tr. 303.

[60]     Id.

[61]     See id.

[62]     See Tr. 304.

walking, sitting, kneeling, stair climbing, and concentrating.[63] In explanation of how her conditions affected the preceding activities, Plaintiff stated that: (1) her knees would stiffen while sitting; (2) it was difficult to straighten again after bending; (3) her knees would hurt from climbing stairs; (4) her migraines affected her concentration; and (5) she could not stand for long periods of time.[64] Plaintiff reported that she could walk for forty-five minutes to an hour before having to stop and rest for an unspecified amount of time.[65]

Plaintiff repeated that she did not have problems paying attention and she was "okay" at following written and spoken instructions.[66] Plaintiff said that she was able to deal with stress but occasionally had difficulty.[67] Plaintiff wore a prescribed knee brace.[68] Plaintiff reported taking medications but declined to list them on the form, explaining that her primary care physician had recently changed her medications and that it was "to[o] early to tell" the side effects.[69]

---

[63] See id.

[64] See id.

[65] See id.

[66] Id.

[67] Tr. 305.

[68] See id.

[69] Tr. 306.

Plaintiff completed a work history report on June 21, 2011.[70] In this report, she detailed her work history from 1999 through 2010, beginning with her work as a certified nursing assistant from 1999 to 2001.[71] Plaintiff also worked in a library during the same time period.[72] Afterwards, Plaintiff worked in shipping and receiving at a factory and then as a cashier for McDonald's in 2002 before joining the Army as a unit supply specialist from 2003 to 2005.[73] As a unit supply specialist, Plaintiff reported that she frequently had to lift fifty pounds or more.[74]

On September 12, 2011, Plaintiff completed another disability report in connection with the appeal of the initial decision to deny benefits.[75] Plaintiff reported changes in her conditions, including more frequent migraines, right knee pain, back pain, and neck stiffness, beginning in June 2011.[76] Plaintiff also reported that, beginning in May 2011, her knees swelled if she walked any distance and that when she would get a migraine she had to lie in bed.[77] Plaintiff also said that the instability in her knees

---

[70]   See Tr. 315.

[71]   See id.

[72]   See id.

[73]   See Tr. 315, 319-20.

[74]   See Tr. 320.

[75]   See Tr. 325-34.

[76]   See Tr. 328.

[77]   See id.

12

prevented her from exercising.[78]  Plaintiff completed a disability report on December 30, 2011, in connection with her request for an ALJ hearing, reporting no changes in her conditions since the report on September 12, 2011.[79]

In September 2011, Frederick Cremona, M.D., ("Dr. Cremona") completed a Physical Residual Functional Capacity ("RFC") Assessment.[80] Dr. Cremona addressed Plaintiff's physical abilities, finding that she was capable of occasionally lifting or carrying up to twenty pounds, frequently lifting or carrying ten pounds, standing and/or walking for a total of about six hours in an eight-hour workday, sitting for a total of about six hours in an eight-hour workday, and unlimited in pushing and/or pulling, other than as shown for lifting and/or carrying.[81]  Additionally, Dr. Cremona found Plaintiff was limited to occasional climbing of a ladder, rope, or scaffolds, but found no other postural limitations.[82] According to Dr. Cremona, the record did not establish any visual, manipulative, or communicative limitations.[83] Dr. Cremona reported that Plaintiff had one environmental limitation, in that she should

---

[78]    See id.

[79]    See Tr. 337-43.

[80]    See Tr. 585-92.

[81]    See Tr. 586.

[82]    See Tr. 587.

[83]    See Tr. 588-89.

avoid concentrated exposure to hazards.[84] Dr. Cremona noted that the record did not include a medical source statement regarding Plaintiff's physical capacity.[85] Dr. Cremona found that Plaintiff's alleged limitations were partially supported by the record evidence.[86]

In November 2011, another Physical RFC was completed by Laurence Ligon, M.D. ("Dr. Ligon").[87] Dr. Ligon reaffirmed Dr. Cremora's findings about Plaintiff's exertional, manipulative, visual, and communicative limitations and agreed with Dr. Cremona that the record did not include a medical source statement regarding Plaintiff's physical capacity.[88] However, Dr. Ligon found that Plaintiff had no environmental limitations, but determined that she had more postural limitations than Dr. Cremora assessed.[89] Specifically, Dr. Ligon found that Plaintiff could only occasionally climb a ramp or stairs, balance, stoop, kneel, crouch, or crawl, and could never climb a ladder, rope, or scaffolds.[90] Dr. Ligon noted that examinations of Plaintiff did not show any "ligamentous laxity, patellar apprehension to lateral stress, [or]

---

[84]    See Tr. 589.

[85]    See Tr. 591.

[86]    See Tr. 590.

[87]    See Tr. 593-600.

[88]    See Tr. 593-97.

[89]    See Tr. 595, 597.

[90]    See Tr. 595.

significant patellar laxity."[91]   Dr. Ligon also indicated that
Plaintiff's x-rays showed no abnormalities, and the MRIs showed no
significant chondromalacia.[92]  Dr. Ligon concluded that the alleged
limitations were not fully supported by record evidence.[93]

Defendant denied Plaintiff's application at the initial and
reconsideration levels.[94]  Plaintiff requested a hearing before an
administrative   law   judge   ("ALJ")   of   the   Social   Security
Administration.[95]  The ALJ granted Plaintiff's request and conducted
a hearing on June 19, 2012, in Houston, Texas.[96]

### C.  First Hearing

At the hearing, Plaintiff and a vocational expert, Kay
Gilreath ("Gilreath") testified.[97]  Plaintiff was represented by an
attorney.[98]

Plaintiff testified that the last time she worked was as a
substitute teacher in Lafayette, Louisiana, in 2010.[99]  Plaintiff
explained that she moved to Houston in March 2011 and was not able

---

[91]    Tr. 600.

[92]    See id.

[93]    See id.

[94]    See Tr. 154-57, 159-62.

[95]    See Tr. 163-64.

[96]    See Tr. 79-102.

[97]    See id.

[98]    See Tr. 79.

[99]    See Tr. 86.

to find work as a substitute teacher after moving.[100]   Plaintiff
tried to find work as a medical technician, the field of her
Associate's degree.[101]   Plaintiff believed she could perform these
past jobs except as limited by migraine headaches.[102]   Plaintiff
explained that she had recently experienced migraine headaches
"sometimes three to four times a week" and that they lasted
"[s]ometimes the whole day, sometimes half the day."[103] Plaintiff's
migraines did not last as long if she took medication at the onset
of the headaches.[104]   After asked about her migraine medications,
Plaintiff said that she took Topiramite to in the morning to
prevent migraines, Amitriptyline at night to help address migraines
and sleeping, and Ibuprofen.[105]   Plaintiff testified that her
migraines started in 2003 and that she had experienced them at the
same frequency of three to four times a week since then.[106]
Plaintiff explained that while the frequency of the migraines had
remained about the same, the severity had increased.[107]   She said
her doctor referred her to a neurologist and that she had seen

---

[100]    See Tr. 87.

[101]    See id.

[102]    Id.

[103]    Tr. 88.

[104]    See Tr. 88-89.

[105]    See Tr. 89.

[106]    See Tr. 90.

[107]    See id.

neurologists who conducted MRIs and prescribed medication when she lived in Louisiana.[108]

The ALJ next turned to questioning Plaintiff about her knee and back impairments.[109]  Plaintiff explained that her knees would collapse if the patella slipped, which would cause her to fall.[110] Plaintiff said that this would happen about five times a month.[111] Plaintiff said that she began to experience back pain after leaving the military, explaining that it was not connected to a specific injury.[112]  Plaintiff's doctor in Louisiana thought that her back issues were connected to her knee problems.[113]  Plaintiff was given a Transcutaneous Eletrical Nerve Stimulation ("TENS") unit, went to physical therapy, and saw doctors and a chiropractor to manage the pain.[114]  One of Plaintiff's medical professionals told Plaintiff that her L1 and L2 vertebrae "were narrowing up the disc" and that she may need injections in the future.[115]

In response to a question from the ALJ, Plaintiff explained that she supported herself with veteran's benefits and supplemental

---

[108]    See id.

[109]    See id.

[110]    See Tr. 91.

[111]    See id.

[112]    See id.

[113]    See Tr. 92.

[114]    See id.

[115]    See id.

17

security income for her twelve-year-old son, who had oppositional defiant disorder.[116]   As school was out of session, Plaintiff's normal day consisted of someone picking her twelve-year-old up in the morning for camp where he would go for the day, and Plaintiff would stay home and play games with her four-year-old.[117]   Plaintiff said that she would also cook and do laundry.[118]   However, if Plaintiff experienced a migraine, she would take medicine and go to bed, because she needed to be in a dark, quiet room.[119]   When that happened, her older son would help take care of her younger son.[120] It was easier for Plaintiff to sit than stand, but she had to reposition herself if she sat too long.[121]   Plaintiff spent more time standing than sitting in a day, and she spent three to five hours a day lying down.[122]

Plaintiff next testified that her pain limited her ability to do certain activities, including going to a theme park or the mall with her children.[123]   Plaintiff said that chiropractor visits helped with the pain, but that these appointments were just

---

[116]   See Tr. 92-93.

[117]   See Tr. 93.

[118]   See id.

[119]   See Tr. 93-94.

[120]   See Tr. 94.

[121]   See id.

[122]   See Tr. 95.

[123]   See Tr. 96.

"temporary fixes" and that she "would just rather be pain-free because [she] would love to go to work."[124]

Plaintiff's attorney wrapped up the questioning of Plaintiff by asking her about the problems she had sleeping at night.[125] Plaintiff explained that her back pain caused her difficulty sleeping, but that Amitriptyline seemed to help her sleep better at night.[126]

At the conclusion of Plaintiff's testimony, Gilreath took the stand to discuss Plaintiff's past work history and the capability of an individual with Plaintiff's RFC to perform those or other jobs.[127]  Gilreath considered Plaintiff's work as a pharmacy technician and babysitter to both be at a light exertional level.[128] The ALJ presented the following hypothetical individual:

> For the purpose of some hypothetical questions, assume with me, if you would, please, that at all times we're dealing with a younger individual, let's assume 29 years of age, one certainly who is literate, who is a high school graduate with two years' worth of college credits and an Associate's degree, one who has the same vocational background as [Plaintiff].  Further assume, please, that the hypothetical individual can stand and walk for four out of eight, can sit for four out of eight, could lift, and carry, and push, and pull an occasional twenty and a frequent ten.  The hypothetical individual would need to be able to change positions at

---

[124]    See id.

[125]    See Tr. 97.

[126]    See id.

[127]    See Tr. 98-101.

[128]    See Tr. 99.

will, but never use ropes, ladders, or scaffolds.  All
other postural movements would be limited to occasional,
that would all be secondary to the issues related to the
back and to the knees.  Additionally, secondary to the
issues relating to the migraines, the hypothetical person
would need to avoid concentrated exposure to intense
lighting and secondary to the pain and the resulting
reduction in concentration, the hypothetical individual
would be limited to detailed but not complex tasks.  As
to that assessment, Ms. Gilreath, if I did agree with it,
could   such   a   person   with   that   profile   perform
[Plaintiff's] past work?  And I guess for past relevant
work, babysitter would be out, as a pharmaceutical
technologist?[129]

Gilreath stated that such an individual could not perform

Plaintiff's prior relevant work as a pharmacy technician but would

be able to work as a unit clerk in a hospital, a teacher's aide, or

companion.[130]   The   ALJ   adjusted   the   hypothetical   person's

limitations by adding that the "individual would need to take

unscheduled breaks of approximately ninety minutes out of each

eight-hour workday secondary to dealing with issues relating to

pain as well as to migraines," and Gilreath said that such a person

could not perform any sort of employment.[131]  The ALJ adjusted the

original hypothetical one more time, adding "that the hypothetical

individual would miss more than three workdays out of each work

month," and Gilreath stated that this hypothetical individual would

not sustain employment.[132]

---

[129]    Tr. 98-99.

[130]    See Tr. 99-100.

[131]    Tr. 100.

[132]    Id.

**D.  ALJ Decision and Remand**

On July 20, 2012, the ALJ issued an unfavorable decision.[133] The ALJ found that Plaintiff last met the insured status requirements on December 31, 2010, and that Plaintiff had not engaged in substantial gainful activity from December 31, 2010, the alleged onset date, through the date last insured.[134]  The ALJ recognized the following impairments as severe: "osteoarthritis of the knees; low back pain; and migraines."[135]  Plaintiff's severe impairments, individually or collectively, did not meet or medically equal any Listing, according to the ALJ.[136]

In determining Plaintiff's RFC to perform work-related activities, the ALJ discussed Plaintiff's alleged symptoms and her medical treatment.[137]  When considering Plaintiff's symptoms, the ALJ first evaluated whether a medically determinable impairment could reasonably be expected to produce the alleged symptoms. Second, he evaluated the "intensity, persistence, and limiting effects of [Plaintiff's] symptoms to determine the extent to which they limit[ed] [Plaintiff's] functioning," making a credibility finding for those symptoms that were not substantiated by objective

---

[133]    See Tr. 132-43.

[134]    See Tr. 137.

[135]    Tr. 137.

[136]    See Tr. 138.

[137]    See id.

medical evidence.[138]

The ALJ discussed Plaintiff's statements regarding the symptoms that she experienced as a result of her impairments.[139] Specifically, the ALJ discussed the symptoms associated with her migraines, knee issues, and back pain.[140]  The ALJ concluded that Plaintiff's statements about her conditions that were not wholly credible.[141]  In support of this conclusion, the ALJ stated that the longitudinal medical evidence reflected that Plaintiff was not as limited as she alleged.[142]  He also concluded that there was "no objective medical evidence to show that the severity would prevent her from doing a job that would follow the above outlined residual functional capacity assessment."[143]

The ALJ discussed Plaintiff's medical treatment, including records of MRIs, physical therapy, and chiropractic therapy through 2010; chiropractic visits from 2009 through June 2011 and the associated x-rays; x-rays of her knees on June 3, 2011; and MRIs of her knees in July 2011 and her brain in April 2012.[144]  The ALJ discussed the Medical Source Statement of Ability to do Work-

---

[138]    Tr. 139.

[139]    See id.

[140]    See id.

[141]    See id.

[142]    See Tr. 140.

[143]    Id.

[144]    See Tr. 139-40.

Related Activities, submitted by a physician's assistant in 2012.[145] The ALJ did not give this opinion much weight because it was inconsistent with the medical evidence and also because an opinion from a physician's assistant was not considered an acceptable medical source under the regulations.[146]

The ALJ considered Plaintiff's disability rating by the VA and her receipt of VA disability benefits.[147] He noted that the VA has a different standard than the Social Security Administration and that he was not bound by the finding of a disability by the Department of Veterans Affairs.[148]

The ALJ found Plaintiff capable of work at the light level of exertion because she could lift/and or carry twenty pounds occasionally and ten pounds frequently and could stand and/or walk six out of an eight-hour work day and sit for six out of an eight-hour work day.[149]  The ALJ included the following limitations in Plaintiff's RFC: (1) an ability to change positions at will; (2) no climbing ramps, ladders, or scaffolds; (3) occasional climbing of stairs; (4) occasional balancing, stooping, kneeling, crouching, and crawling; (5) avoiding exposure to intense lighting; and (6)

---

[145]    See Tr. 141.

[146]    See id.

[147]    See Tr. 141.

[148]    See id.

[149]    See Tr. 138.

performing detailed but not complex job tasks.[150]

The ALJ found Plaintiff unable to perform her past relevant work, citing the vocational expert's opinion.[151] The ALJ noted that, if Plaintiff had been able to perform a full range of light work, the Medical-Vocational Guidelines[152] directed a finding of not disabled.[153] However, his RFC assessment did not find Plaintiff capable of a full range of light work; thus, the ALJ explained, he relied on the testimony of the vocational expert to determine whether Plaintiff could perform other work.[154] Based on Gilreath's response to the ALJ's hypothetical question asking whether a person with Plaintiff's age, education, work experience, and RFC could perform work available in the state and national economy, the ALJ stated that he found Plaintiff capable of performing the requirements of occupations such as unit clerk, teacher's aide, and companion.[155] The ALJ found that Plaintiff had not been under a disability as of December 31, 2010, the date last insured.[156]

Plaintiff appealed the ALJ's decision, and, on August 27, 2012, the Appeals Council vacated the decision and remanded

---

[150]   See id.

[151]   See Tr. 141-42.

[152]   20 C.F.R. Pt. 404, Subpt. P, App. 2.

[153]   See Tr. 142.

[154]   See id.

[155]   See Tr. 142-43.

[156]   See Tr. 143.

Plaintiff's case to the ALJ.[157]  The Appeals Council instructed the
ALJ, on remand, to: include the dates for Exhibits 10F through 12F,
as they were incorrectly listed as undated; consider Plaintiff's
subjective complaints in accordance with the regulations; look more
closely at Plaintiff's maximum RFC and cite evidence in support of
the limitations; obtain more evidence from the vocational expert
and change the hypothetical questions to more accurately encompass
the entire record; and address and resolve conflicts between the
vocational expert's testimony, the Dictionary of Occupational
Titles, and the Selected Characteristics of Occupations.[158]

**E.  Second Hearing**

After the case was remanded, a hearing was held by a different
ALJ in Houston, Texas, on July 24, 2013.[159]  Plaintiff and a
vocational expert, Patricia A. Cowen ("Cowen") testified.[160]
Plaintiff was represented by an attorney.[161]

Plaintiff testified about her work history, stating that she
went to school to become a pharmacy technician, and earned credit
hours for the job when she worked at Walmart.[162]  However, Plaintiff

---

[157]   See Tr. 148-51.

[158]   See Tr. 150.

[159]   See Tr. 103-29.

[160]   See Tr. 64, 103.

[161]   See Tr. 103, 106.

[162]   See Tr. 108-11.

did not pass the test to become certified.[163]   In regards to
Plaintiff's job as supply technician for the Army, Plaintiff stated
that the heaviest object she had to lift was a sleeping bag, and
Cowen accordingly characterized this job as light.[164]   Plaintiff
stated that she did not receive unemployment benefits, but that she
did receive benefits from the VA that averaged approximately $1,200
a month, based on a sixty-percent disability rating.[165]   When asked
why she had not found work in Houston as a substitute teacher,
Plaintiff explained that she "tried to work" but "[n]o one called
[her]."[166]   Plaintiff also stated that her migraines prevented her
from working, as did the side effects from the shots and
medications she had to take for the migraines.[167]   The ALJ asked
Plaintiff if she was receiving child support, and Plaintiff stated
that she was owed child support, but she was not actually receiving
it.[168]

     The ALJ asked Plaintiff for more details about her
migraines.[169]   Plaintiff explained that the cause was unclear and
they came at different times during the day, but she was journaling

---

[163]   See id.

[164]   See Tr. 112.

[165]   See Tr. 114-15.

[166]   Tr. 115.

[167]   See id.

[168]   See Tr. 115-16.

[169]   See Tr. 116.

their onset to help better identify a cause.[170]   Plaintiff said that her migraines normally would last for the entire day.[171]   In terms of her knee pain, Plaintiff explained that she had chondromalacia in both knees which caused them to collapse.[172]   An orthopedist told Plaintiff that there was a surgical procedure to correct such a problem but he did not recommend it for her.[173]

In terms of Plaintiff's typical day, she said that after her children went to school, she would cook or lie down, depending on how she felt.[174]   Plaintiff said she would also run errands, go to doctor's appointments, or go to group therapy sessions for anxiety and depression.[175]   Plaintiff explained that she also would go to a mosque on Fridays and have dinner with a friend.[176]   Plaintiff said that her friends come to her house and that she had a "good support system."[177]

Plaintiff's testimony then turned to a discussion of Plaintiff's prescribed medications.[178]   Plaintiff said that she took

---

[170]     See id.

[171]     See Tr. 116–17.

[172]     See Tr. 117.

[173]     See id.

[174]     See Tr. 118.

[175]     See Tr. 118–19.

[176]     See Tr. 119.

[177]     Id.

[178]     See id.

Zolmitriptan, in the form of a shot, twice a day, until her doctor told her that she was overdosing, so she reduced it to one dose a week.[179]   Plaintiff explained that she was now "on a new regimen" and was taking Topiramite twice a day, Duloxetine for her migraines, iron supplements, Zyrtec, and Ibuprofen.[180]   Plaintiff also explained that she used a TENS unit and an ointment for her back pain.[181]

When asked about how much weight she was able to lift, Plaintiff said she could carry "probably two gallons of milk" from her car to her apartment.[182]   Plaintiff explained that her back and knees prevented her from lifting anything heavier.[183]   When asked if she was more comfortable sitting or standing, Plaintiff said that she would need to alternate between sitting and standing, and that she was able to stand for an hour before needing to sit because of her knees.[184]   Plaintiff added that she would only be able to sit for about two hours, depending on how her back felt.[185]   Plaintiff said that she was not able to walk far, and measured how far she could walk by saying that she could go to the grocery store, but

---

[179]   See Tr. 119-20.

[180]   Tr. 120-21.

[181]   See Tr. 121.

[182]   Tr. 122.

[183]   Id.

[184]   See id.

[185]   See id.

could not take her children to the zoo.[186]

In terms of everyday tasks, Plaintiff stated that she did not have any issues with bathing or getting dressed.[187]  Plaintiff said that she could cook for her family when she was not having a migraine, so she would cook "to last" when she was feeling well.[188] Plaintiff's son would help her keep the apartment clean.[189] Plaintiff testified that she was doing exercises to help her lower back pain and strengthen her knees.[190]  In terms of her migraine headaches, when Plaintiff's head began throbbing, she was forced to lie down in the dark, and she would sometimes vomit.[191]

Plaintiff said that she was no longer having sleeping problems because of the Topiramate.[192]  Plaintiff said that this medication also helped to counteract mood problems she experienced while taking Cymbalta.[193]  Plaintiff was seeing a therapist once every three weeks.[194]

Plaintiff said that if she went back to work, she would have

---

[186]     See Tr. 123.

[187]     See id.

[188]     See id.

[189]     See id.

[190]     See Tr. 124.

[191]     See Tr. 125.

[192]     See Tr. 124.

[193]     See id.

[194]     See Tr. 125.

to miss work because her migraines were unpredictable.[195]   When
Plaintiff first worked as a substitute teacher, she would take any
job offered, but later only took jobs in high schools because the
children in elementary schools were loud and would give her
headaches.[196]

At the end of Plaintiff's testimony, she explained that her
headaches and knee problems began when she was in boot camp for the
Army.[197]

Cowen discussed Plaintiff's past work history and the
capability of an individual with Plaintiff's RFC to perform those
or other relevant jobs.[198]   The ALJ presented the following
hypothetical individual:

> hypothetically, assume a person the same age, education,
> work history as [Plaintiff].  Assume a person limited to
> sitting six hours, standing and walking six hours,
> lifting and carrying twenty pounds occasionally, ten
> pounds frequently, occasional climbing but no climbing of
> ladders, ropes, or scaffolds, occasional kneeling, and
> crawling.   Any past work going to be available for a
> person with those limits?[199]

Cowen stated that such an individual could perform Plaintiff's
past relevant work as a pharmacy technician or supply technician.[200]

---

[195]   See Tr. 126.

[196]   See id.

[197]   See Tr. 127.

[198]   See Tr. 127-29.

[199]   Tr. 127-28.

[200]   See Tr. 128.

Cowen also testified that an individual with Plaintiff's work history and education could perform jobs such as a cashier, general clerk, or file clerk, of which there are at least 2,000 jobs, each, in the Houston area, and more than 200,000, each, nationwide.[201]

Plaintiff's attorney asked Cowen about how often someone could miss work but still maintain employment.[202]   Cowen said that this would vary by employer but that, on average, anything more than two or more absences a month would probably lead to termination.[203]

## F.  Commissioner's Decision

On July 23, 2013, the ALJ issued an unfavorable decision.[204] The ALJ found that Plaintiff last met the requirements of insured status on December 31, 2010, and that Plaintiff had not engaged in substantial gainful activity on December 31, 2010, the alleged onset date and the date last insured.[205]   The ALJ recognized the following impairments as severe: "headaches, back problems, and chondromalacia of the knees."[206]   The ALJ noted Plaintiff's alleged impairment due to mental problems, but stated that Plaintiff "was not evaluated for and diagnosed with mental problems until March

---

[201]   See id.

[202]   See id.

[203]   Tr. 128-29.

[204]   See Tr. 61-73.

[205]   See Tr. 66.

[206]   Tr. 67.

2013, which was more than two years after the date last insured,"
and, therefore, depression was not a medically determinable
impairment as of December 31, 2010.[207]

Plaintiff's severe impairments, individually or collectively,
did not meet or medically equal any Listing, according to the
ALJ.[208]  In particular, the ALJ considered Listing 1.02 (major
dysfunction of a joint), Listing 1.03 (reconstructive surgery or
surgical arthrodesis of a major weight-bearing joint), and Listing
1.04 (disorders of the spine).[209]

In determining Plaintiff's RFC to perform work-related
activities, the ALJ discussed Plaintiff's alleged symptoms and her
medical treatment in the context of the regulatory requirements.[210]
When considering Plaintiff's symptoms, the ALJ first evaluated
whether a medically determinable impairment could reasonably be
expected to produce the alleged symptoms.[211]  Second, he evaluated
the "intensity, persistence, and limiting effects of [Plaintiff's]
symptoms to determine the extent to which they limit[ed]
[Plaintiff's] functioning," making a credibility finding for those
symptoms that were not substantiated by objective medical

---

[207]   Id.

[208]   See id.

[209]   See id.

[210]   See Tr. 68-71.

[211]   See Tr. 68-69.

evidence.[212]

The ALJ engaged in a thorough account of Plaintiff's statements regarding the symptoms that she experienced as a result of her impairments.[213] Specifically, the ALJ discussed the symptoms associated with her migraines and back and knee pain.[214] The ALJ concluded that while Plaintiff's impairments could cause her symptoms, her statements about the extent of her impairments were not fully credible.[215]

The ALJ turned to a discussion of Plaintiff's medical treatment, including records from 2008 through 2013 related to her treatment for knee pain; from medical scans and evaluations related to her back pain; and from medical scans and tests related to her headaches.[216] The ALJ also discussed the opinion of a physician's assistant and Plaintiff's VA disability status.[217]

The opinion of the physician's assistant was given very little weight, because, as the ALJ wrote, it went further "than [Plaintiff's] own allegations in finding functional limitation" and the opinion was from March 2012, past the date in question.[218] The

---

[212]   Tr. 68.

[213]   See id.

[214]   See Tr. 69.

[215]   See id.

[216]   See Tr. 69-70.

[217]   See Tr. 70-71.

[218]   Id.

ALJ also discussed Plaintiff's sixty-percent VA disability, which she received in October 2008 for osteomalacia and headaches, but noted that while he considered the determination as some evidence of an impairment, the standards the VA used were different than those under the SSA.[219]

The ALJ found Plaintiff capable of lifting or carrying twenty pounds occasionally and ten pounds frequently and that she was able to stand or walk six hours out of an eight-hour work day and sit for six hours out of an eight-hour work day.[220]   The ALJ included the limitation of occasional climbing, kneeling, or crawling in Plaintiff's RFC.[221]

Based on this RFC, the ALJ found Plaintiff was capable of performing her past relevant work as a pharmacy clerk and lab technician because this work did not require performance of work-related activities precluded by her RFC.[222]   Therefore, the ALJ concluded that Plaintiff was not under a disability on December 31, 2010.[223]

Plaintiff appealed the ALJ's decision, and, on October 2, 2014, the Appeals Council denied Plaintiff's request for review,

---

[219]   See Tr. 71.

[220]   See Tr. 68.

[221]   See id.

[222]   See Tr. 71.

[223]   See Tr. 73.

34

thereby transforming the ALJ's decision into the final decision of
the Commissioner.[224]  After receiving the Appeal's Council's denial,
Plaintiff sought judicial review of the decision by this court.[225]

## II.   Standard of Review and Applicable Law

The court's review of a final decision by the Commissioner
denying disability benefits is limited to the determination of
whether: 1) the ALJ applied proper legal standards in evaluating
the record; and 2) substantial evidence in the record supports the
decision.  Waters v. Barnhart, 276 F.3d 716, 718 (5th Cir. 2002).

## A.  Legal Standard

In order to obtain disability benefits, a claimant bears the
ultimate burden of proving she is disabled within the meaning of
the Act.  Wren v. Sullivan, 925 F.2d 123, 125 (5th Cir. 1991).
Under the applicable legal standard, a claimant is disabled if she
is unable "to engage in any substantial gainful activity by reason
of any medically determinable physical or mental impairment. . .
which has lasted or can be expected to last for a continuous period
of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); see
also Greenspan v. Shalala, 38 F.3d 232, 236 (5th Cir. 1994).  The
existence of such a disabling impairment must be demonstrated by
"medically acceptable clinical and laboratory diagnostic" findings.
42 U.S.C. § 423(d)(3); see also 42 U.S.C. § 423(d)(5)(A); Jones v.

---

[224]    See Tr. 55–58.

[225]    See Doc. 1, Pl.'s Compl.

Heckler, 702 F.2d 616, 620 (5th Cir. 1983).

To determine whether a claimant is capable of performing any "substantial gainful activity," the regulations provide that disability claims should be evaluated according to the following sequential five-step process:

> (1) a claimant who is working, engaging in a substantial gainful activity, will not be found to be disabled no matter what the medical findings are; (2) a claimant will not be found to be disabled unless [s]he has a "severe impairment;" (3) a claimant whose impairment meets or is equivalent to [a Listing] will be considered disabled without the need to consider vocational factors; (4) a claimant who is capable of performing work that [s]he has done in the past must be found "not disabled;" and (5) if the claimant is unable to perform h[er] previous work as a result of h[er] impairment, then factors such as h[er] age, education, past work experience, and [RFC] must be considered to determine whether [s]he can do other work.

Bowling v. Shalala, 36 F.3d 431, 435 (5th Cir. 1994); see also 20 C.F.R. § 416.920.  The analysis stops at any point in the process upon a finding that the claimant is disabled or not disabled. Greenspan, 38 F.3d at 236.

**B.  Substantial Evidence**

The widely accepted definition of "substantial evidence" is "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." Carey v. Apfel, 230 F.3d 131, 135 (5th Cir. 2000).  It is "something more than a scintilla but less than a preponderance." Id.  The Commissioner has the responsibility of deciding any conflict in the evidence. Id.  If the findings of fact contained in the Commissioner's

decision are supported by substantial record evidence, they are conclusive, and this court must affirm.   42 U.S.C. § 405(g); Selders v. Sullivan, 914 F.2d 614, 617 (5th Cir. 1990).

Only if no credible evidentiary choices of medical findings exist to support the Commissioner's decision should the court overturn it.   Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988).   In applying this standard, the court is to review the entire record, but the court may not reweigh the evidence, decide the issues de novo, or substitute the court's judgment for the Commissioner's judgment.   Brown v. Apfel, 192 F.3d 492, 496 (5th Cir. 1999).   In other words, the court is to defer to the decision of the Commissioner as much as is possible without making its review meaningless.   Id.

### III. Analysis

Plaintiff requests judicial review of the ALJ's decision to deny disability benefits.   However, Plaintiff has not submitted a motion for summary judgment.   In its motion, Defendant argues that the Commissioner's decision is supported by substantial evidence and that the ALJ did not commit legal error.

The court finds that the Commissioner's decision was supported by substantial evidence.   In this case, the ALJ considered the evidence related to Plaintiff's back, knee, and migraine complaints in support of his finding that Plaintiff was not disabled on December 31, 2010.   The records from Plaintiff's chiropractor

37

demonstrate that Plaintiff complained of only minimal or very mild pain in her back, knees, and neck and very mild headaches on December 30, 2010, the day before the date last insured.

Additionally, MRIs of Plaintiff's brain from 2009 and 2010 were normal. MRIs of Plaintiff's knees from 2010 were normal, and MRIs taken in 2011 showed issues of "questionable clinical significance" and no significant chondromalacia. The ALJ also considered 2012 opinion from a physician assistant, but found that it was not proper medical evidence and that it went further then Plaintiff's own complaints of her impairments.

This medical evidence supported the ALJ's finding that Plaintiff could perform light work. The ALJ also considered Plaintiff's disability rating from the VA but was correct in noting that the Social Security Administration uses a different standard of review to determine a disability and that the VA rating was not dispositive to the present dispute.

The court finds that the Commissioner's decision was supported by substantial evidence and that the ALJ did not commit legal error. The ALJ properly considered the findings of the vocational expert and the submitted medical evidence which supported his finding that Plaintiff was not disabled under the SSA as of December 31, 2010.

## IV. Conclusion

Based on the foregoing, the court **RECOMMENDS** that Defendant's

motion for summary judgment be **GRANTED**.

The Clerk shall send copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections thereto pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002-13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk electronically. Copies of such objections shall be mailed to opposing parties and to the chambers of the undersigned, 515 Rusk, Suite 7019, Houston, Texas 77002.

**SIGNED** in Houston, Texas, this 18th day of January, 2017.

U.S. MAGISTRATE JUDGE